THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* BERNARD K. MARCUS, SAUL SINGER and HERBERT SINGER, Appellants.

(Argued January 16, 1933; decided March 14, 1933.)

*Charles H. Tuttle* for Bernard K. Marcus, appellant. Since the indictment does not allege that the purchase was not for one of the corporate purposes of the safe deposit company, the indictment does not establish or show that there was in point of fact a misapplication of the latter's funds. The indictment contains nothing which overcomes the presumption that the alleged transaction was *intra vires* and valid and that the defendants were innocent. (*People* v. *Kane*, 161 N. Y. 380; *Pettibone* v. *United States*, 148 U. S. 197; *United States* v. *Hess*, 124 U. S. 483; *Dyer* v. *Broadway Central Bank*, 252 N. Y. 430; *Block* v. *Pennsylvania Exchange Bank*, 252 N. Y. 227; *Jacobs* v. *Monaton*, 212 N. Y. 48.) The error in the court's charge to the jury was the interpretation of section 305 of the Penal Law in such wise as to exclude as a defense lack of moral turpitude or wrongful intent or even ignorance that the application was in law.

a misapplication. (*United States* v. *Britton*, 107 U. S. 655; *Evans* v. *United States*, 153 U. S. 584; *Potter* v. *United States*, 155 U. S. 438; *United States* v. *Harper*, 33 Fed. Rep. 471; *United States* v. *Steinman*, 172 Fed. Rep. 913; *United States* v. *Breese*, 173 Fed. Rep. 402; *Dow* v. *United States*, 82 Fed. Rep. 904; *Cooper* v. *United States*, 13 Fed. Rep. [2d] 16.) The court's definition of the word " willfully " and its exclusion of any element of wrongful intent, and even of any knowledge or notice that the application was a misapplication, were contrary to the plain meaning of the statute. (*Stokes* v. *People*, 53 N. Y. 164; *People* v. *Martin*, 205 N. Y. 275; *People* v. *Harrison*, 238 N. Y. 348; *Wass* v. *Stephens*, 128 N. Y. 123; *People* v. *Baylinson*, 211 App. Div. 40; *People* v. *Brinkman*, 193 App. Div. 691; *People* v. *Martinitis*, 168 App. Div. 446; *Hewitt* v. *Newburger*, 141 N. Y. 538; *People* v. *Boas*, 29 Hun, 377; 92 N. Y. 560; *People* v. *Anderson*, 122 Misc. Rep. 801; *People* v. *Clark*, 242 N. Y. 313; *People* v. *Bates*, 79 Hun, 584; *Potter* v. *United States*, 155 U. S. 438; *People* v. *Stevens*, 109 N. Y. 159.) The court erroneously charged the jury that the advice of counsel, and even the defendants' reliance in good faith upon the propriety and legality of the transaction as a result of such advice, were irrelevant to any issue in the case, even to the issue of willfulness. (*Dyer* v. *Broadway Central Bank*, 252 N. Y. 430; *Block* v. *Pennsylvania Exchange Bank*, 253 N. Y. 227; *Williamson* v. *United States*, 207 U. S. 425; *People* v. *Bates*, 29 Hun, 377, 92 N. Y. 560.) The court committed error in charging the jury that reliance by the defendants on the tacit, if not express, approval by the Superintendent of Banks was irrelevant to any issue in the case, even the issue of willfulness. (*People* v. *Clark*, 242 N. Y. 313; *People* v. *Bates*, 79 Hun, 584; *People* v. *Boas*, 29 Hun, 377; 92 N. Y. 560; *State* v. *Givens*, 28 Ida. 253.) The trial court erroneously charged that as matter of law the three financial companies could lawfully borrow from the bank only

$4,200,000 in the aggregate. (*People* v. *Grout*, 174 App. Div. 608; *Berkey* v. *Third Ave. Ry. Co.*, 244 N. Y. 84; *Werner* v. *Hearst*, 177 N. Y. 63; *American Cyanamid Co.* v. *Wilson & Toomer Fertilizer Co.*, 51 Fed. Rep. [2d] 669; *Bee Building Co.* v. *Daniel*, 57 Fed. Rep. [2d] 59; *Elenkrieg* v. *Siebriecht*, 238 N. Y. 254; *Stone* v. *C., C., C. & St. Louis Ry. Co.*, 202 N. Y. 352; *Pullman's Palace Car Co.* v. *Missouri Pacific Ry. Co.*, 115 U. S. 587; *Peterson* v. *Chicago, Rock Island & Pacific Ry. Co.*, 205 U. S. 364; *People ex rel. Studebaker Corp.* v. *Gilchrist*, 244 N. Y. 114.) The trial court clearly committed reversible error in allowing the prosecution in rebuttal to call witnesses to contradict the denial by Mr. Kresel, called as a defense witness, that he had made certain alleged statements before the grand jury of a character very prejudical to the defendants and to the honesty of the transaction. (*United States* v. *Sager*, 49 Fed. Rep. [2d] 725; *People* v. *De Garmo*, 179 N. Y. 130; *People* v. *Grout*, 174 App. Div. 608; 222 N. Y. 521; *Stokes* v. *People*, 53 N. Y. 164; *Carpenter* v. *Ward*, 30 N. Y. 243; *Potter* v. *Brown*, 197 N. Y. 288; *Holmes* v. *Anderson*, 18 Barb. 420; *Matter of Eno*, 196 App. Div. 131; *Schnell* v. *Plumb*, 55 N. Y. 592; *People* v. *Richardson*, 222 N. Y. 103; *People* v. *Razezicz*, 206 N. Y. 249; *People* v. *Harris*, 209 N. Y. 70; *People* v. *Sharp*, 107 N. Y. 427.)

*Nathan L. Miller, Harold H. Corbin* and *Edward J. Bennett* for Saul Singer, appellant. The indictment does not charge a crime under section 305 of the Penal Law. (*People* v. *Farson*, 244 N. Y. 413; *People* v. *Kane*, 61 N. Y. Supp. 632; 43 App. Div. 472; 161 N. Y. 380; *Batchelor* v. *United States*, 156 U. S. 426; *United States* v. *Britton*, 107 U. S. 655; *Donegan* v. *United States*, 196 Fed. Rep. 843; 265 U. S. 585; *People* v. *Hungerford*, 229 Misc. Rep. 777; *People* v. *Arnstein*, 78 Misc. Rep. 18; *People* v. *Bates*, 61 App. Div. 559; *Hyde* v. *Equitable Life Assur. Society*, 61 Misc. Rep. 518; *Dyer* v. *Broadway Central Bank*, 252 N. Y. 430; *Block* v. *Pennsylvania*

*Exchange Bank,* 253 N. Y. 227; *Kingsbury* v. *State,* 235 Pac. Rep. 140; *People* v. *Zambournis,* 251 N. Y. 94; *Kent* v. *Quick Silver Mining Co.,* 78 N. Y. 159; *Bath Gas Light Co.* v. *Claffy,* 151 N. Y. 24; *Coffin* v. *United States,* 156 U. S. 432; *United States* v. *Morse,* 161 Fed. Rep. 429; *United States* v. *Heinze,* 218 U. S. 532; *United States* v. *Northway,* 120 U. S. 327.) The court erred in its charge in defining the words "abstract" and "willfully misapply," and in thereby eliminating from consideration the lack of design to injure or defraud, the absence of evil purpose or criminal intent and the defenses of good faith resulting from honest mistake as to the law and reliance on advice of counsel. (*People* v. *Clark,* 242 N. Y. 313; *People* v. *Stevens,* 109 N. Y. 159; *People* v. *Martinitis,* 168 App. Div. 446; *People* v. *Boas,* 29 Hun, 377; 92 N. Y. 560; *People* v. *Bates,* 79 Hun, 584; *People* v. *Foster,* 204 App. Div. 295; *People* v. *Baylinson,* 211 App. Div. 40; *People* v. *Harrison,* 238 N. Y. 348.) Error was commited in allowing the State to call witnesses in rebuttal to disprove a denial by Mr. Kresel on cross-examination of a statement said to have been made by him to the grand jury. (*People* v. *Malkin,* 250 N. Y. 185; *Matter of Eno,* 196 App. Div. 131; *Potter* v. *Brown,* 197 N. Y. 288; *People* v. *De Garmo,* 179 N. Y. 130; *Carpenter* v. *Ward,* 30 N. Y. 243; *United States* v. *Sager,* 49 Fed. Rep. [2d] 725; *Holmes* v. *Anderson,* 18 Barb. 420; *Schell* v. *Plumb,* 55 N. Y. 592; *Bright* v. *Wheelock,* 20 S. W. Rep. [2d] 684; *Schneiderman* v. *Sesanstein,* 121 Ohio St. 80; *Southern Ry. Co.* v. *Mc Neill,* 155 Fed. Rep. 756; *Flanery* v. *Chicago Ry. Co.,* 197 N. W. Rep. 747; *Morton* v. *State,* 43 Tex. Crim. Rep. 533.) The trial court erred in receiving proof of defendant Singer's refusal to answer questions before the Attorney-General on the ground that the answers might tend to incriminate him, and in charging that such refusals could be considered as affecting his credibility. (*People* v. *Michor,* 226 App. Div. 570;

*People ex rel. Taylor* v. *Forbes,* 143 N. Y. 219; *People ex rel. Lewisohn* v. *O'Brien,* 176 N. Y. 253; *People* v. *Gillette,* 126 App. Div. 665; *State* v. *Bailey,* 54 Iowa, 114; *Lloyd* v. *Passingham,* 16 Ves. Jr. 59; *Millman* v. *Tucker,* Peake Add. Cas. 222; *Bunckley* v. *State,* 77 Miss. 540; *Parrot* v. *Commonwealth,* 47 S. W. Rep. 452; *Lowenherz* v. *Merchants & Mechanics Bank,* 144 Ga. 556; *Masterson* v. *St. Louis Transit Co.,* 204 Mo. 507; *Garrett* v. *St. Louis Transit Co.,* 219 Mo. 65; *People* v. *Manganaro,* 218 N. Y. 9; *People* v. *Sobieskoda,* 235 N. Y. 411.)

*Harold R. Medina* for Herbert Singer, appellant. The evidence is insufficient to sustain the charge that the defendant Herbert Singer did feloniously aid and abet and feloniously counsel, command, induce and procure the commission of the acts alleged to constitute the crime of willful misapplication of funds. (*People ex rel. Perkins* v. *Moss,* 113 App. Div. 329; 187 N. Y. 410.)

*Thomas C. T. Crain, District Attorney* (*Robert C. Taylor* of counsel), for respondent. The People's case was fully proved. (*Jemison* v. *Citizens' Sav. Bank,* 122 N. Y. 135.) The indictment was sufficient. (*People* v. *Bogdanoff,* 254 N. Y. 14; *People* v. *Pavesi,* 227 App. Div. 846; *People* v. *Bush,* 140 Misc. Rep. 59; *People* v. *Schubert,* 140 Misc. Rep. 689; *People* v. *Auerbach,* 140 Misc. Rep. 767; *People* v. *Kaplan,* 143 Misc. Rep. 91; *People* v. *Lisandrelli,* 139 Misc. Rep. 129.) The charge was correct. (*People* v. *Harrison,* 238 N. Y. 348; *People* v. *Brooks,* 1 Den. 457; *Morris* v. *People,* 3 Den. 381; *Clark* v. *Miller,* 47 Barb. 38; *Cowley* v. *People,* 21 Hun, 415; 83 N. Y. 464; *People* v. *Pierson,* 176 N. Y. 201; *People* v. *Marrin,* 205 N. Y. 275; *Anderson* v. *How,* 116 N. Y. 336.) The charge was accurate and adequate. (*People* v. *Abeel,* 182 N. Y. 415; *People ex rel. Hegeman* v. *Corrigan,* 195 N. Y. 1; *People* v. *Persce,* 204 N. Y. 397.) Where a defendant intentionally commits a prohibited act, it is no defense that he acted in good faith under legal advice, inasmuch

as ignorance or mistake of the law is no defense to a criminal prosecution. (*Gardner* v. *People,* 62 N. Y. 299; *People* v. *Powell,* 63 N. Y. 88; *People* v. *Weed,* 29 Hun, 628; 96 N. Y. 625; *Hamilton* v. *People,* 57 Barb. 625.) Kresel's direct testimony was essentially material. The defense brought it out, and cannot be heard to say that it was not material. Cross-examination, to lay a basis for impeachment, must be upon material matters. (*Carpenter* v. *Ward,* 30 N. Y. 243; *Plato* v. *Reynolds,* 27 N. Y. 586; *Stokes* v. *People,* 58 N. Y. 164; *People* v. *Van Tassel,* 156 N. Y. 561; *Blossom* v. *Barrett,* 37 N. Y. 434; *Dick* v. *Marvin,* 188 N. Y. 426; *People* v. *Blake,* 121 App. Div. 613; 193 N. Y. 616; *People* v. *Leonardo,* 199 N. Y. 432; *Mance* v. *Harrington,* 205 N. Y. 33; *People* v. *Webster,* 139 N. Y. 73; *Turner* v. *Keller,* 66 N. Y. 66; *People* v. *Warder,* 231 App. Div. 215; *People* v. *Courtney,* 94 N. Y. 490.) Upon the trial, the prior refusals of defendants Marcus and Singer to answer questions were elicited, and the jurors were instructed that they might consider these circumstances as bearing upon credibility. (*People ex rel. Taylor* v. *Forbes,* 143 N. Y. 219; *Matter of Levy & Becker,* 255 N. Y. 223; *People* v. *Michor,* 226 App. Div. 569; *Commonwealth* v. *Smith,* 163 Mass. 411; *Raffel* v. *United States,* 271 U. S. 494.)

CRANE, J. The Municipal Safe Deposit Company was organized under the Banking Law (Cons. Laws, ch. 2) in 1924, the principal office of the corporation being located in the borough of Brooklyn, county of Kings, State of New York. Its capital stock was $100,000 and the incorporators were all Brooklyn men having at that time no connection with The Bank of United States. Later the stock of the company was acquired by the bank, the defendants Marcus and Singer becoming directors. This was a genuine corporation, not a paper organization, for it had safe deposit vaults and carried on business at 350 Stone avenue, Brooklyn, Seventh avenue and Twenty-eighth street, Forty-fourth street and Eighth avenue, and

70 Wall street, Manhattan. Additional safe deposit equipment for vaults in these last three places was purchased as late as July, 1930. On January 1st of 1930 its vaults and safes were valued at about $292,000, and its stock and bond investments totaled $855,726. It had an excess of assets over liabilities of over $33,000. The company was in a good financial position.

On January 13, 1930, Marcus and Singer, as directors and the controlling power in this safe deposit company, borrowed from The Bank of United States $2,009,518.45, on its four months' note, and with it purchased twenty-five shares of the Premier Development Corporation, which represented assets of a book value of $1,200,000. The purpose of making this purchase had nothing to do with the business of the safe deposit company; neither was it for the purpose of investing its funds, capital or assets. The purpose was to pay off excessive loans of other corporations in which these two men were financially interested and reduce an indebtedness of those companies to The Bank of United States.

The defendants, in consequence, have been charged, tried and convicted of abstracting and willfully misapplying the funds and property of the Municipal Safe Deposit Company, of which they were directors.

The position of a director is one of trust, in which he owes an active duty of faithful conduct, both to the stockholders and to the creditors of his corporation. By section 326 of the Banking Law, these directors were required to take an oath, to diligently and honestly administer the affairs of the safe deposit company, and not knowingly to violate, or willingly permit to be violated, any of the provisions of law applicable thereto. These two directors took this oath, although apparently at a belated date.

The duties of a director have heretofore been stated by this court (*Kavanaugh* v. *Commonwealth Trust Co.*, 223 N. Y. 103, 106). We there said: " They should know

of and give direction to the general affairs of the institution and its business policy, and have a general knowledge of the manner in which the business is conducted, the character of the investments and the employment of the resources. No custom or practice can make a directorship a mere position of honor void of responsibility, or cause a name to become a substitute for care and attention. The personnel of a directorate may give confidence and attract custom; it must also afford protection."

A director owes loyalty and allegiance to the corporation he undertakes to serve and his willful derelictions are not excusable because his numerous directorates make his duties conflicting. He cannot choose which he will serve, so long as he chooses to serve all. No one is compelled to be a director, but once the office is assumed, it carries with it the light burden of active, diligent and single-eyed service. Numerous are the provisions of our statute law seeking to compel directors to live up to this very reasonable standard, and among these is found section 305 of the Penal Law, which reads as follows:

" § 305. Any officer, director, trustee, employee or agent of any corporation to which the banking law is applicable, who abstracts or wilfully misapplies any of the money, funds or property of such corporation, or wilfully misapplies its credit, is guilty of a felony. Nothing in this section shall be deemed or construed to repeal, amend or impair any existing provision of law prescribing a punishment for any such offense."

To gather the full purport and meaning of this section it may be contrasted with a like, but more limited, law enacted by Congress for national banks. Section 5209 of the United States Revised Statutes provides: " Any officer, director, agent, or employee of any federal reserve bank, or of any member bank as defined in sections 221 to 225 of this title, who embezzles, abstracts, or wilfully misapplies any of the moneys, funds, or credits of such

federal reserve bank or member bank * * * with intent * * * to injure or defraud such federal reserve bank or member bank, or any other company, body politic or corporate, or any individual person * * * shall be deemed guilty of a misdemeanor, and upon conviction thereof in any district court of the United States shall be fined not more than $5,000 or shall be imprisoned for not more than five years, or both, in the discretion of the court."

The words, " with intent to injure or defraud the bank or any other company," do not appear in our statute, section 305 of the Penal Law, and we have no right or power to read them into the law. The Legislature of this State, no doubt from past experiences, took a broader view and made it illegal for a director knowingly to use the assets of his corporation for other than corporate purposes or proper and legitimate investment, even though he had no intention of cheating or defrauding anybody. Good intentions do not justify the misapplication or misuse of corporate assets when the directors know that the use they are making of them is not for the benefit of the company, but for the use and benefit of other enterprises in which they are interested.

Such has been the interpretation of a like law by the Supreme Judicial Court of the State of Massachusetts, in *Commonwealth* v. *Nichols* (257 Mass. 289), under a statute which made it a crime to " wilfully misapply moneys, funds, credits or other property " of a bank. The court noted the difference between the statute of Massachusetts and the Federal statute, above quoted, and approved the instruction to the jury, which said: " Misapply means to use the funds of the bank in a manner or for a purpose not authorized by law, to divert the funds from a rightful or legitimate purpose to a wrongful or illegitimate purpose, to use the funds improperly, and that must be done to come within the prohibition of the statute, wilfully. * * *

" Wilful implies an action by the will or mind; it means to do the act by design, intentionally, or with a set purpose, and it doesn't necessarily, as used in this statute, imply that there was a wrongful intention, or malicious or criminal design. To wilfully misapply means just this — that the person charged with committing that offence or wilfully misapplying must intentionally, or with a purpose, or a design use improperly the moneys, funds or credits of the bank and use them in a way not authorized by law.   *   *   *

" We think," said the Supreme Court, " the trial judge was not bound by the construction given to the words by the courts of the United States.   The instruction given by him accords better with the intent of the Legislature, disclosed by the way in which it varied its enactment from the form of the Federal statute, to guard against a wider range of improper actions by officials and employees of banks than was denounced by the earlier statute."

We are now to determine whether or not our statute, under which these defendants have been indicted and tried, means what it says, and whether or not the defendants have been proved guilty in accordance with the law. The facts are somewhat complicated, but the principle to be applied is very simple.   Through the maze of the evidence we must keep in mind that the object in view is to show that the defendants, directors of the Municipal Safe Deposit Company, misapplied its property, knowing that they were misapplying it, and willfully abstracted it to use for other purposes than those of the Municipal Safe Deposit Company.   These are the facts:

Saul Singer was vice-president, director and chairman of the executive committee of The Bank of United States. Bernard K. Marcus was president and director of The Bank of United States.   In 1927 Marcus and Singer, with others, incorporated the City Financial Corporation, of which Marcus became director and chairman of the

board, and Saul Singer, president and director. This corporation dealt in securities which it was illegal for a bank to hold. In other words, its activities covered a field of finance which could not be entered by a bank under the Banking Law. The business of the corporation prospered so that in the following year, 1928, Marcus, Singer and others formed the Bankus Corporation, as an affiliate of The Bank of United States, and to acquire the City Financial Corporation. This Bankus Corporation acquired all the stock of the City Financial Corporation with the exception of a few shares. Each stockholder of The Bank of United States was also a stockholder of the Bankus Corporation. Singer testified that the two companies had so merged into one that their offices were at the same place and the bookkeepers and clerks were the same.

The purpose for forming the Bankus Corporation, to thus take over the City Financial Corporation, was stated by Saul Singer, when a witness upon the stand. He said: " The purpose was to have an affiliate with the bank, an affiliated corporation. It was quite the vogue, the fashion, and we proceeded to have one, and we thought it would be best to eliminate the other one, or to absorb the other one, and that is the plan that we went through." The " other one " was the City Financial Corporation. Thus, the Bankus and the City Financial Corporation, according to Singer's testimony, were absorbed into one — at least in business affairs.

Later there was a third company, known as the Municipal Financial Corporation, which had been affiliated with the Municipal Bank and Trust Company. When this latter company was taken over by The Bank of United States, the Bankus Corporation and the City Financial Corporation absorbed the stock of the Municipal Financial Corporation, sixty-three (63) per cent going to Bankus, and thirty-seven (37) per cent to the City Financial. But as the City Financial had been absorbed

(to use Singer's words) into the Bankus, the Bankus Corporation was the City Financial Corporation and the Municipal Financial Corporation. It owned or controlled the stock of these other two. At the same time the Bankus Corporation was owned by the stockholders of The Bank of United States and was an affiliate of that institution.

Marcus and Singer controlled and dominated the financial corporations. Up to this point, therefore, we find that this affiliate of The Bank of United States, the Bankus Corporation, owned, controlled or had absorbed by its stock ownership the other two financial corporations. The point of this is that through the action and domination of Singer and Marcus, The Bank of United States had loaned to its affiliates — for thus they were — twelve million ($12,000,000) dollars, or eight million ($8,000,000) dollars more than the Banking Law allowed. The capital, surplus and undivided profits of The Bank of United States amounted to about forty-one million ($41,000,000) dollars.

The Banking Law, section 108, subdivision 1, provides that a bank " shall not directly or indirectly lend to any individual, partnership, unincorporated association, corporation, or body politic, an amount which * * * will exceed one-tenth part of the capital stock and surplus of such bank."

Subdivision 1-d provides: " In computing the total liabilities * * * of any corporation to a bank there shall be included all loans made for the benefit of the corporation."

Therefore, if we consider these three financial corporations as being one borrower within the spirit and intent of these provisions, we find The Bank of United States loaning twelve million ($12,000,000) dollars, when it could have loaned, under the Banking Law, not more than $4,100,000. This loan was divided up into three parts: $4,000,000 apparently was borrowed by Bankus, $4,000,000

by the City Financial and $4,000,000 by the Municipal Financial. Whether or not we consider these three separate and distinct corporations as in actual fact one borrower, through the stock ownership of Bankus, these defendants, Marcus and Singer, apparently considered the loans excessive and in violation of the law, for such is the significance of the testimony. Eight million dollars of the loan was paid off as hereinafter described, on January 13, 1930. More will be said hereafter about this, but for the present, as bearing upon the amount of these loans, Singer testified: " Q. And is it a fact that you calculated at that time the surplus, the capital, the surplus and the undivided profits at about a little over $40,000,000 (referring to The Bank of United States)? A. Yes, sir.

" Q. And 10 per cent of that would have brought it to $100,000 or $200,000 above $4,000,000, wouldn't it? A. Yes, sir.

" Q. And the actual indebtedness actually became as a result of the anticipation two days before the examination $3,850,000, is that right? A. Yes, that's right."

Much of this $12,000,000 indebtedness to The Bank of United States had been incurred after May of 1929, and in the summer and fall of that year had been the subject of marked criticism by the Banking Department. Bankus Corporation had voluntarily submitted to an examination by investigators of the Banking Department and the report which was given to Marcus and Singer severely criticized their actions and these loans. Whether these reports were justified is not the point. The fact is that in September, 1929, Marcus and Singer knew that these loans had to be reduced and were not sanctioned by the Banking Department. The reports referred to an abuse of influence of the dominating officers of the bank, Marcus and Singer, to their own profit, and referred to schedules showing the use of the corporation and its subsidiaries " as pawns to conceal manoeuvers of Marcus and Singer for such purposes as ' window-dressing ' a statement of

the bank." These reports and the direction of the Superintendent of Banks following thereon, that the loans of these financial corporations must be reduced, led to numerous conferences which resulted in the acts for which these two defendants have been convicted.

Referring to the City Financial, the Municipal Financial and the Bankus Corporation, Singer testified that he and Marcus " were the whole thing in all of them." Therefore, it was for them to procure the money with which to pay off this $12,000,000 indebtedness and reduce it to the proper limits of $4,100,000. How were they to get the money? These financial corporations had book assets of $4,800,000, real estate equities in extensive real estate and real estate building operations. The equities were of questionable value because of the underlying mortgages and liens upon the property. The first suggestion, that these equities be bonded, and the bonds sold, and the proceeds paid to The Bank of United States, was abandoned for the reason that the income from the properties would not be sufficient to pay the interest on the bonds. Many conferences were held in the fall of 1929 between Marcus, Singer, Kresel, young Herbert Singer and others to devise means and plans for raising $8,000,000. Securities were falling, values were disappearing and real estate equities were on the downward road. Seligman, the banker, was appealed to with the object of having him purchase the stock or units of the bank. The stock of The Bank of United States was sold in units, each share of stock carrying with it stock of the Bankus Corporation. In October the proposed deal with Seligman fell through. Then Saul Singer suggested the idea and the plan of selling these real estate equities, having a book value of $4,800,000, to their safe deposit companies for $8,000,000. This plan was ultimately carried through on January 13, 1930.

The scheme was to have three safe deposit companies borrow $8,000,000 from The Bank of United States on

their four months' notes; with this $8,000,000, buy the real estate equities of the financial corporations; the financial corporations receiving the $8,000,000 would turn it back to The Bank of United States, which, in turn, would reduce the debt of the financial corporations $8,000,000 by the use of its own money. In short, The Bank of United States was to credit the financial corporations with $8,000,000 on the security of their real estate holdings which, Singer admitted, the bank could not do directly. The way in which it was accomplished indirectly and the safe deposit companies, of which Singer and Marcus were directors, burdened with $8,000,000 of debts in place of the financial corporations, remains to be explained.

Singer was asked why the financial corporations did not turn over their real estate equities, worth $4,800,000, or $8,000,000, to The Bank of United States directly, and thus reduce to this extent the indebtedness of $12,000,000. He said it could not be done because the bank could not take such assets. Then was devised the plan of accomplishing the same thing by indirection through the use of their safe deposit companies. These companies were the Municipal Safe Deposit Company, the City Safe Deposit Company and the Colonial Safe Deposit Company. The stock of these companies was owned by The Bank of United States, and Singer was a director in all three of them, and Marcus a director of the Municipal and president and director of the other two. Instead of selling the assets of the financial corporations directly to these safe deposit companies, two dummy corporations were brought into existence, known as the Premier Development Corporation and the Bolivar Development Corporation, each having one hundred shares of stock, of no par value.

On January 13, 1930, the financial corporations transferred their assets, with a book value of $4,800,000, to the Premier Corporation, for one hundred shares of its stock.

The one hundred shares were then transferred by the financial companies to the Bolivar Development Company for the same figure, which in turn sold the one hundred shares of the Premier Company to the three safe deposit companies for $8,000,000, the Municipal Safe Deposit Company receiving as its portion twenty-five shares, for which it paid $2,009,518.45; the other two deposit companies received their proportion and paid to the Bolivar Development Company the balance of the amount going to make up the $8,000,000. Of course no money was passed. The Municipal Safe Deposit Company, as we stated at the beginning of this opinion, was a going concern, carrying on a safe deposit business, with assets in excess of liabilities, and property consisting of vaults and investments in its various branch offices. These safe deposit companies had no money with which to buy $8,000,000 of real estate equities. The $8,000,000 was borrowed from The Bank of United States on the notes of the safe deposit companies, and then the transaction took the form of passing the money to the Bolivar, from the Bolivar to the financial companies and from the financial companies back to the bank in payment of the $4,000,000 due from the Bankus and the $4,000,000 due from the City Financial, leaving $4,000,000 owing from the Municipal Financial. In this way The Bank of United States passed $8,000,000 to the credit of the Bankus and the City Financial, and had for it the three notes of the safe deposit companies; and back of these notes were the hundred shares of the Premier Development Company; and back of these hundred shares of the Premier Development Company was the $4,800,000 book value — real estate equities — which Saul Singer valued in a falling market at $8,000,000.

Much was said by counsel, upon argument and in the briefs, about this being a legitimate investment for the safe deposit companies, because the Bolivar Development Corporation and the financial corporations had agreed to

repurchase these one hundred shares of stock for $8,000,000 any time the safe deposit companies desired to " reverse the transaction." The Bolivar Development Corporation was owned by Herbert Singer, who paid $100 for it. He couldn't repurchase anything. The financial corporations could not pay their debts to The Bank of United States without borrowing the money of The Bank of United States with which to pay them. The repurchase agreements were mere empty forms; there was no substance to them.

With this statement of the facts we have the charge against these three defendants that, in violation of section 305 of our Penal Law, they willfully abstracted and misapplied the money, funds and credit of the Municipal Safe Deposit Company, of which two of them were directors.

That Singer and Marcus did this thing is conceded by them. The plan was Singer's, acquiesced in by Marcus, carried out by both of them. Referring to the Premier, the City, and Municipal Financial and the Bankus, Singer was asked this question: " Q. You and Marcus were the whole thing in all four of them, weren't you? A. Yes, sir."

That they controlled absolutely the Municipal Safe Deposit Company is also beyond dispute. The plan was carried out at the direction of these two men. Reading the minutes of the safe deposit companies one would think that there had been regular meetings authorizing this borrowing from The Bank of United States and the purchase of the twenty-five shares of the Premier Corporation. The minutes of January 13, 1930, state that Marcus, Singer, Pollock, Adamson and Mitchell were present and authorized these transactions. No such thing. There was no meeting. No one was present. Waivers were sought to be obtained from Adamson, Pollock and Mitchell long after January 13th. One director refused to sign them. The minutes are fictitious, written up in the

lawyer's office, as though the corporation had acted in due and formal manner. The use of the credit and money of the safe deposit companies was the act of Singer and Marcus, and they admit it.

The next question is, was the money applied for the purpose and use of the safe deposit company, or, was it taken and used for another purpose outside of any legitimate investment for the safe deposit company? Saul Singer answers this question. He testified that the Bank Superintendent spoke to them about the indebtedness of the affiliates to the bank. " Mr. Broderick spoke about that and he thought that as a deal we ought to abolish it, and we agreed with him, and he said that as soon as we possibly could pay these loans off, that we should do so." After testifying to the proposal to sell bonds, and the Seligman transaction, he continued by saying: " Mr. Marcus stated that the bank could not hold any stock, but a safe deposit company could, and that in that case we ought to sell some of our securities to the safe deposit companies, and the safe deposit companies in turn will pay the corporation — the corporations in turn will pay off their indebtedness to the bank." Again, he said: " Marcus said we could borrow the money from the bank for the safe deposit companies and make the purchase." And finally, in giving his reasons for shifting the debts of the financial corporations onto the three safe deposit companies, he testified: " We thought it would be an advantageous thing to have these loans reduced and we felt in view of the general conditions prevailing at that time and in view of the fact that securities companies had suffered so greatly by the break in the market, reducing their securities to a degree that these type of companies were not any longer in favor, as they were a year before, we felt that it would be a much more favorable picture if our loans would be reduced in the corporations.

" Q. Haven't you testified over and over again, Mr. Singer, that the purpose was of the whole plan so that the

City Financial Corporation and the Bankus Corporation could pay off these notes? A. Yes, sir.

" Q. There was no thought at any time of doing anything for the Municipal Safe Deposit Company? The Municipal Safe Deposit Company did not need any favors, did it? A. No, sir.

" Q. It did not owe anybody anything, did it? A. No, sir."

And further, he says: " The Superintendent suggested that these notes should be paid off. Following that came the break in the market. After the break these security companies affiliated with Bankus had met with disfavor in the public mind, because of the break in the market and of shrinkage of securities. * * *

" Q. Did these safe deposit companies participate in any transactions in which the indebtedness owed by the three financial companies to The Bank of United States of $12,000,000, originated? A. No, sir.

" Q. Had nothing to do with the incurring of that indebtedness? A. No, sir."

From this testimony it is quite apparent that the indebtedness of the Bankus and the City Financial Corporation of $8,000,000 was shifted over onto the safe deposit companies for no business or purpose connected with them, and that these companies borrowed $8,000,000 on their four months' notes for no legitimate investment or business transaction of their own but for the purpose of paying the debts of the two financial corporations.

Were the real estate equities of the book value of $4,800,000, represented by the hundred shares of Premier Development Corporation stock, worth $8,000,000; or did Singer and Marcus know they were not? As said before, the securities selected to be transferred to the safe deposit companies by means of the one hundred shares of stock of the Premier Corporation were equities in large real estate buildings known as the Squibb Building, 70 Wall Street, Sun Holding Corporation, American Title and

Guarantee Company stock, San Remo Towers property, and others. Singer testified that these equities could not be bonded and the bonds sold, as the properties were unrented in part, unfinished, and the income would not pay the interest. He also testified that he knew the bank could not legitimately and directly take these securities. When asked why they did not sell them and turn the cash over, he admits that they could not be sold at that time for the price paid.

But we need not enlarge upon the evidence any further, as sufficient appears to show that Marcus and Singer, directors of the Municipal Safe Deposit Company, procured on its note a loan of $2,009,518.45 from The Bank of United States, and with it purchased twenty-five shares of the Premier Development Corporation, representing equities in real estate of doubtful value, and with this money paid the indebtedness of other corporations in which they were interested.

There is here ample evidence out of their own mouths to show a violation of section 305 of the Penal Law and the willful misapplication of corporate funds.

Objection has been made to the form of the indictment. We think it sufficiently states the crime charged against these defendants and the facts constituting the crime. It is true that the circumstances of the misapplication might have been more fully set forth, but in view of the knowledge which these defendants had of all these transactions and the fact that the plans and schemes are admitted by them to have been their own, the reference in the indictment to a willful misapplication of the funds of the Municipal Safe Deposit Company by the purchase of twenty-five shares of the Premier Development Corporation gave them fair warning of the nature of the alleged crime. The familiarity shown by Marcus and Singer with all the details of these intricate transactions does not harmonize with their plea that the indictment

was not sufficiently specific to bring home to them the charge.

Objection has been made to the wide field of operations covered by the evidence. The statute requires knowledge upon the part of defendants that they are misapplying the funds. To show this knowledge required a very extended examination into the transactions of these officers, in procuring the loans from The Bank of United States, the operations for their own benefit of the City Financial Corporation and the syndicate formed to sell stock; of the incorporation of the Bankus and the manipulation of the three financial companies, as though they were the individual property of Singer and Marcus. It was relevant to show the necessity of raising the $8,000,000 to pay off the excessive loans. The safe deposit companies did not need $8,000,000, as their business was confined, by the Banking Law and their charters, to the safe-keeping of property and the investment in furnishings for this purpose. A safe deposit company does not carry on any banking or investment business except as it invests its own meager capital. The evidence regarding the real estate transactions and the value of the equities in the properties held by the financial corporations came into the case without objection, and was relevant in showing that these two defendants knew that the value of the securities they were passing off onto the safe deposit companies was questionable.

Singer was asked whether upon a previous examination by the Attorney-General he had refused to testify on the ground that his answers might incriminate him. Overlooking the absence of any motion to strike out his answer in the affirmative, we shall refer to the explanation given by Singer for thus refusing to testify. His explanation was stricken out by consent of his own counsel. He said: " I believed that all those questions that were being asked were not being asked me from good faith, and that is the reason I have answered it that way." As

the witness' counsel consented to have the answer stricken out, there is little force in the claim now made that the jury was left to find another reason for Singer's refusal to answer. But without stopping at this time to consider whether this court will follow the ruling in *Commonwealth* v. *Smith* (163 Mass. 411), and *Raffel* v. *United States* (271 U. S. 494), we do say, with the Appellate Division, that even if it were error to press these questions on cross-examination, it was immaterial and harmless considering that the testimony of Singer and Marcus upon the witness stand described the transactions in full. Some day it may be necessary to refer to our rulings in *People* v. *Montforte* (256 N. Y. 159) and *Matter of Levy* (255 N. Y. 223), but this is not the occasion. This immateriality of error also applies to similar questions asked of Marcus who claimed a constitutional privilege.

Isidor J. Kresel was called as a witness for the defense. As attorney for The Bank of United States and the City Financial Corporation he was familiar with all the transactions of these companies down to the incident of January 13, 1930, as to which his memory was somewhat shaky. There was testimony that he was consulted in all these transactions and advised as to the papers used in accomplishing the result. He did say on direct examination, when examined by Singer's counsel, " My recollection is that either Mr. Marcus or Mr. Singer brought up the subject of the indebtedness of the companies to the bank, and particularly the criticism of the Superintendent of the banks about those loans, and said that they desired to pay those loans off — that they had certain securities — that is, the companies had certain securities for which they could not then find a ready market, but they desired to use those securities for the purpose of paying those loans; that the securities were at a book value, stood on the books of the company, at about $4,800,000, but that Mr. Singer felt that they were worth about $8,000,000; that they would be sufficient to pay the loans of the

City Financial and Bankus Corporation to the bank and that they had been considering the advisability of selling these securities of the safe deposit companies for $8,000,000, the safe deposit companies to borrow the money from the bank, pay it to these companies, which would then use it in liquidation of their indebtedness to the bank." He says he advised that the matter be taken up with the Superintendent of Banks.

On direct examination he was handed defendant's Exhibit 6Z which reads as follows: " Bolivar hereby agrees that should Municipal repurchase said twenty-five (25) shares of stock of Premier Development Corporation at $2,009,518.45, plus interest at six (6%) per cent from the date hereof to the date of purchase, then it, Bolivar, will pay to Municipal the difference between what Municipal shall have so paid to the Safe Deposit Company and the amount Municipal would have had to pay to Bolivar under its option, under paragraph 4 hereof."

This had reference to the repurchase papers drawn up for the transactions of January 13, 1930, as above detailed. On this exhibit, in the handwriting of Mr. Kresel, were changes and interlineations showing that he must have been somewhat familiar with the purpose of the draft and the object of its use and also with the two corporations, the Premier and the Bolivar. Another exhibit, Defendant's Exhibit 4S, detailing the various real estate holdings which constituted the assets of the financial corporations and values placed thereon, was also connected with this witness. On cross-examination he was asked if he had made this statement before the grand jury: " Now, I come back to it. I have nothing to do, and did not know of the course that this transaction took. I do not understand why it should have been necessary to have this devious way of having these two corporations (Premier and Bolivar). I have talked about that. One explanation given to me is that there

was a tax problem involved. That if one of these corporations for $4,800,000 of property, which it then sold for $8,000,000, realized the difference as a profit, it would be subject to a tax, and they, up there, were advised by outside tax people, so I understood — I am not vouching for this — that it was wiser to pass it through another corporation. But the very fact that it was passed through that way indicates that there was something suspiciously wrong about it. I would have nothing to do with that sort of a transaction. It is unfortunate that the man who was in my employ was the man who had charge of it." The witness denied making such a statement before the grand jury.

To the introduction of this evidence on cross-examination and to the answer given there was no objection taken at the trial.

Witnesses were called later to prove that Kresel had made this statement, and now it is pressed upon us that this was reversible error. Personally, I think it was competent. From these exhibits brought out on direct examination the witness apparently knew about the Bolivar and the Premier Corporations and the methods being used through them to transfer the assets to the safe deposit companies, and this answer before the grand jury tended to contradict it. The inconsistency bore directly upon his credibility, if his testimony meant anything at all to the defendants. His statement, that " the very fact that it was passed through that way indicates that there was something suspiciously wrong about it," was certainly inconsistent with his testimony regarding these exhibits, which, as they had been initialed and corrected by him, indicated his guidance in the way. The law is that a witness cannot be contradicted upon an immaterial matter or on a mere expression of an opinion. (*Matter of Eno*, 196 App. Div. 131.) But these matters were not immaterial. These statements were in conflict with both the attitude and the testimony of the witness

upon his direct examination. But whether I am right or wrong about this, the majority of the court are of opinion that this evidence played a very little part in the case and could by no means have affected the result. All of the facts stated in the answer before the grand jury were given in evidence by other witnesses, in fact, by the defendants themselves. Surprising indeed would it be if through eleven volumes of testimony, constituting the record in this case, there did not creep in some errors in the admission and exclusion of evidence. The seriousness of the error depends upon the nature of the case, and its relation to the other evidence. These rulings, if erroneous, were in their setting harmless. The fact that these defendants may have been advised by their attorney that this application of funds was legal, or the fact that no loss followed, would not constitute a defense or justify a violation of section 305 of the Penal Law. (*Commonwealth* v. *Nichols*, 257 Mass. 289.)

We, therefore, conclude that the judgment convicting these defendants, Singer and Marcus, must be affirmed.

Not so regarding Herbert Singer. As to him our view is different. He is the son of Saul Singer, a young lawyer recently admitted to the bar, and was a clerk in Mr. Kresel's office, at a salary of twenty-five dollars to fifty dollars a week. He was not a director or officer of any of the corporations, and so far as the evidence shows, not financially interested in them, outside of the hundred dollars he put up for the Bolivar Corporation. The scheme and plan of transferring the debts of the financial corporations to the safe deposit companies were not his, but his father's, and the father on the stand took all the responsibility. He said, regarding the Bolivar Corporation, " We made Herbert Singer own the Bolivar." Kresel said, regarding the offices of the financial corporations, " And I put that young man up there with the idea of taking care of the details and he became extremely proficient * * * and the matters up there were

incidental and I put that young man up there with the idea of taking care of details."

The exhibits referred to, shown to Mr. Kresel in his examination, bear out the testimony that this young clerk submitted the papers for approval, or some of them, to his superior law associate. He was employed by Mr. Kresel, the attorney for all these companies, and his duty was to his employer, in the first instance. This of course would not excuse the young man from participating in a crime, but it is difficult to believe that he intentionally aided or assisted his father and Marcus in willfully misappropriating the funds of corporations of which they were directors. They did not need his assistance in devising or carrying out the plan, other than such assistance as is rendered by lawyers' clerks in drawing necessary papers. No doubt the young man was quite capable in handling these details and profuse in his advice. We are not unfamiliar with the importance frequently assumed by the young practitioner who is apt to magnify his work and worth. It is inconceivable that Saul Singer, who, in thirty-two years after landing in this country, had passed from the crockery, steam laundry and garment business to the position of one of the leading financiers in New York city, could be influenced or directed by the young son he had brought up in the soft places in life. The drive from the bottom to the top develops courage, resolution and determination little swayed by the neophyte, fresh from his books. There is, therefore, no evidence in this case warranting the conclusion that Herbert, the law clerk, aided and assisted criminally in the misappropriation of the funds of these safe deposit companies. That he aided by his work as a clerk is, of course, conceded; that he aided as a participant in the misapplication as a criminal act is not proven.

The judgment as to Saul Singer and Bernard K. Marcus should be affirmed. The judgment as to Herbert Singer should be reversed, and the indictment dismissed.

LEHMAN, J. (dissenting in part). The defendant Bernard K. Marcus was, in 1930, and for some years prior thereto, the president of The Bank of United States and the defendant Saul Singer was its vice-president. Together they, in large measure, directed and controlled the affairs of the bank and its affiliated or subsidiary corporations. The bank has been unable to meet its obligations to its depositors and none can doubt that if these defendants, as its executive officers, have been guilty of any misapplication of its funds, or criminal failure to perform their duties as officers or directors, they should be punished. They have not been charged with such wrong. They have been indicted and convicted upon the charge that as directors of the Municipal Safe Deposit Company they " did abstract and wilfully misapply the money, funds and property of the said corporation called Municipal Safe Deposit Company by wilfully and feloniously procuring and causing and wilfully and feloniously concurring in procuring and causing the said corporation * * * to pay to a certain other corporation called Bolivar Development Corporation the sum of $2,009,-518.45 to enable the said corporation called Municipal Safe Deposit Company to purchase, acquire and hold for its own, twenty-five shares of the stock of another corporation called Premier Development Corporation."

The undisputed facts upon which the People's claim is based are set forth in the opinion of Judge CRANE. In January, 1930, three financial corporations, affiliated, or wholly owned, subsidiary corporations of The Bank of United States, had borrowed from the bank about twelve million dollars. To meet objections by the Banking Department to these loans, it was necessary to reduce these loans, but the borrowers had no money or marketable securities which could be used for that purpose. The complicated series of transactions, set forth in the opinion of Judge CRANE, were devised and carried out for the purpose of reducing, at least in form, the loans to the

three financial corporations and substituting, in place thereof, loans to three safe deposit companies, of which the Municipal Safe Deposit Company was one, all of which companies were also wholly owned subsidiary corporations of the bank. That plan may have staved off immediate disaster to the bank and permitted it to continue in business for some months. It did not otherwise work any substantial change in the bank's position. The bank parted with no money or other property and received no money or other property. Its officers could, in accordance with the terms of the contracts between the various corporations and through control of all the corporations involved, at any time reverse the entire series of transactions and enforce the original obligation of the financial corporations. On the other hand, it had acquired from the three safe deposit companies a formal obligation to pay a loan in which they had not been previously interested; but since the bank was the sole stockholder of the three safe deposit companies, this obligation on paper constituted no substantial benefit to the bank and no substantial detriment to the safe deposit companies.

In fact, all that the defendants have been charged with is the use of moneys borrowed by the safe deposit companies from the bank, for the benefit of the bank which was its sole stockholder. They claim that they believed that in serving the interests of the bank they were serving, indirectly, the interests of the safe deposit companies which constituted a part of the elaborate corporate structure centering in the bank. They acted, so they claim, in honest reliance on the advice of counsel that what they did was lawful and proper. They are charged only with dereliction of duty as directors of the Municipal Safe Deposit Company and not with dereliction of duty as directors and officers of the bank. That is the only charge which the trial judge could or did submit to the jury. They took action as directors of the Municipal Safe Deposit Company only after the loans which

threatened disaster to the banks had already been made and for the purpose of meeting objections to such loans.

The Penal Law provides that: "Any officer, director, trustee, employee or agent of any corporation to which the banking law is applicable who abstracts or wilfully misapplies any of the money, funds or property of such corporation, or wilfully misapplies its credit, is guilty of a felony." (§ 305.) The Municipal Safe Deposit Company is organized under article VIII of the Banking Law and the officers and directors of that corporation are subject to the penalties imposed by the Penal Law for any willful misapplication of its funds. The section of the Penal Law which has been invoked against the defendants is, I agree, broader than the analogous Federal law applicable to national banks. The Penal Law of this State is violated by a willful misapplication of the money, funds or property of a corporation to which the Banking Law is applicable even though there is no intention to injure or defraud any person or corporation. (*Commonwealth* v. *Nichols*, 257 Mass. 289.)

It may be true that a diversion of the moneys of the safe deposit company from the treasury of that company to the treasury of its sole stockholder is, at least, a technical misapplication, within the meaning of section 305 of the Penal Law, of the moneys of the Municipal Safe Deposit Company, though such moneys were borrowed from the stockholder to be used for the benefit of the stockholder. The safe deposit company, as Judge CRANE points out, was, in law, an independent corporation, organized under the provisions of the Banking Law. The Legislature has placed upon officers and directors of such corporations obligations beyond those of officers and directors of other organizations and has imposed a penalty for such violation. Though the motives of the officers in disregarding such obligations may not be corrupt; though no injury may come to any party from such disregard, a willful — that is, an intentional —

violation of these obligations is visited under the law with severe penalties, and no director or officer who disregards such obligations can legitimately complain when the courts enforce according to their letter the provisions of law enacted for the protection of the public.

Assuming that the defendants have misapplied the moneys of the safe deposit company by using the money it borrowed for the benefit of the bank, the question still remains whether that misapplication has been *willful*. The State does not punish, as a felony, error of judgment on the part of a corporate officer and there can be no " willful misapplication " where a corporate officer, acting on behalf of the corporation uses the corporate moneys for what he believes to be a legitimate corporate purpose.

The trial judge charged the jury that " to constitute a violation of the statute, the People must prove that the act complained of was done with full knowledge of its nature and consequences, and while the doer is in possession of all the facts concerning the transaction, and that having all these facts before him, he intentionally and designedly commits the acts complained of, and knowingly and intentionally applies the funds of the corporation to an improper use." That charge is, I think, substantially in accordance with the construction of a similar statute of Massachusetts which was approved by the Supreme Judiciary Court of that State (*Commonwealth* v. *Nichols, supra*).

Ignorance of the extent of their duties and obligations as officers and directors of a banking corporation would constitute no defense to a charge of intentional violation of such obligations. The law fixes those obligations and even honest acceptance of the advice of counsel that no such obligation exists cannot serve to diminish or alter the obligations which the law imposes. The test in each case is whether the defendants " intentionally and designedly " committed the acts complained of and " knowingly and intentionally applied the funds of the

corporation to an improper use." Advice of counsel as to whether a use is lawful and proper may be a factor in applying that test. The defendants here claim, in effect, that they believed that they were acting for the benefit of the corporation when they used its funds to purchase the stock of another corporation, to be held by the safe deposit company in order to enable the seller to apply the purchase price upon the loans by The Bank of United States and thus prevent disaster to the whole chain of banking institutions. They further claim that they acted in honest reliance upon the advice of counsel that such use of the moneys of the safe deposit company was a proper and legitimate use of its corporate funds. If that be true then the defendants did not act with full knowledge of the nature and consequences of what they were doing and, though their use of the corporate moneys may have been improper, they did not *knowingly* misapply the corporate funds.

Though the trial judge did, in form, submit to the jury the question of whether the defendants knowingly and intentionally applied the funds of the corporation to an improper use, he also charged the jury: " That means that the party doing the act does it with full knowledge of all the facts and circumstances; that he does not act through a mistaken idea as to what the facts are; that he knows the facts at the time he acts, and knowing the facts, under my interpretation of the law, he does it intentionally. And ' misapply ' merely means to apply to an improper purpose." Again and again in his charge he informed the jury that to " find that the defendants were guilty of the willful misapplication of the funds, it would not be necessary for you to find that they acted maliciously or wantonly. All you would have to find is that they devoted the funds of this safe deposit company to an improper use, and that at the time they did so, they were in possession of all the facts and circumstances concerning the transaction. There you have the gist of

the whole case." Again he charged: " It is for you to say whether or not the defendants did burden the Municipal Safe Deposit Company with this indebtedness for a purpose from which the said company could not benefit; and whether or not, if they did so, they did it intentionally and by design * * * and it is for you to say whether or not they knew all the facts concerning this transaction at the time the transaction went through." Finally, the trial judge completely withdrew from the jury any question as to the defendants' honest belief in the advice of counsel that the acts done by them were legal; stating: " The advice of counsel as to the legality of an act is material and has a bearing in a criminal prosecution only when by the statute which defines the crime the intent of the person committing the act is an integral part of the crime * * * But there is no intent mentioned in this section under which these defendants are being prosecuted. That section simply says ' abstract or wilfully misapply.' It does not say ' misapply with intent to steal,' or with an intent to use, or anything of that sort, but simply says ' abstract or wilfully misapply.' " The meaning of the entire charge is clear. The jury were in effect told that if these defendants knowingly applied the moneys or property of the corporation to a purpose which was in fact improper or not permitted by law, then they are guilty of willfully misapplying the corporate property and have violated the statute though their motives may have been good; though they may have had no intention of deriving any personal profit from their acts; though they may have honestly relied on advice of counsel that the law permitted them to apply the corporate funds exactly as they did and believed that such use was proper and for the ultimate benefit of the corporation.

The crime, as defined by the Legislature, is not merely a misapplication of corporate funds, but a willful misapplication, that is, a misapplication intentionally carried

out. To show intent, the People must prove that the defendants acted with knowledge of the nature and consequences of the acts done by them. So the trial judge correctly charged. The question remains whether knowledge of the nature and consequences of the acts done includes knowledge that the acts done constitute a misapplication, *i. e.*, an improper or unlawful use of corporate funds. If it does, then advice of counsel and honest reliance thereon and a belief that the act done is proper, have a direct bearing in this criminal prosecution. Indeed, these would be the decisive factors in the determination of the guilt of the defendants. (*People* v. *Clark,* 242 N. Y. 313.) Such questions have never been passed upon by the jury for the trial judge charged that they were irrelevant. His construction of the statute is that there is a " willful " misapplication of corporate funds if they are intentionally applied to purposes which are in fact improper and illegitimate regardless of whether or not the defendants believed that they were proper and lawful.

The proof is so overwhelming that the officers of the safe deposit company did use its corporate funds for the purpose of benefiting The Bank of United States rather than the corporation itself, that errors in the admission of evidence might well be disregarded if that construction is correct. If, on the other hand, an essential element of the crime charged is an intent to use the funds for a purpose which to the knowledge of the defendants would constitute a misapplication of the corporate funds, then there must be a new trial, for the evidence on that point is far from strong and that question has been completely withdrawn from the jury.

The language of the statute seems to me to leave no doubt that an intent to misapply is an essential element of the crime. Without it a conscientious, careful director or officer might be guilty of a felony by the use of corporate funds in a manner which be believed to be authorized by law even though he acted with honest motives and

under advice of counsel. Perhaps even counsel who advised him as to the legality and propriety of his action might be charged with aiding and abetting the commission of the crime. The language of the statute should not be stretched to produce so extraordinary a result. These defendants may have been guilty of innumerable derelictions and violations of the criminal law as directors and officers of The Bank of United States. In this prosecution, however, they have not been charged with, or convicted of, such derelictions or violations. They have been convicted only of misapplying the money or property of a corporation wholly owned by The Bank of United States through the use of such funds for the benefit of The Bank of United States regardless of whether they derived any personal profit from such use; regardless of whether they acted in honest reliance on the advice of counsel; regardless of whether their motives were good or bad.

In this view of the case, it is unnecessary to consider the alleged errors in the admission and exclusion of evidence. Most of the testimony adduced at the trial is entirely immaterial and irrelevant to the charge against these defendants and, in my opinion, the admission in evidence of the transcript of Mr. Kresel's testimony before the grand jury and questions put to these defendants on cross-examination were clearly erroneous and prejudicial.

I concur in the reversal of the judgment of conviction against Herbert Singer and vote for a new trial for the other defendants.

KELLOGG, HUBBS and CROUCH, JJ., concur with CRANE, J.; POUND, Ch. J., and O'BRIEN, J., also concur with CRANE, J., except as to Herbert Singer and vote to affirm the judgment as to him; LEHMAN, J., dissents in opinion as to Saul Singer and Bernard K Marcus.

Judgment accordingly.