OPINION OF THE COURT
Chief Judge Cooke.
A bank officer or employee who, without more, extends to an individual credit in amounts exceeding civil limits is not guilty of feloniously misapplying bank funds. “Wilful misapplication”, as that term is used in section 673 of the Banking Law, requires that the offender have a personal pecuniary interest in the transactions before criminal liability will attach.
Subdivision 1 of section 103 of the Banking Law generally prohibits a bank from lending to any single customer “an amount which will exceed ten percentum of the [bank’s] capital stock, surplus fund and undivided profits”. To the extent that the loans are secured by collateral having an ascertainable market value, the amount the bank may lend to a customer may rise to 25% of its capital stock, surplus fund, and undivided profits (Banking Law, § 103, subd 1, par [d], cl [2]). Section 103 is a civil regulation only; it does not prescribe penal sanctions for its violation.
*200 Subdivision 1 of section 106 of the Banking Law imposes various limitations on the amount of funds one bank may deposit with another. Defined in terms of percentages of the depositor bank’s capital stock surplus fund, and undivided profits, the limits range from 10% to 200%. The specific limitation depends on whether the depository bank has been so designated by a majority of the depositor bank’s directors and whether it is located in this State and authorized by the Superintendent of Banking to act as a -depository for purposes of section 106. As with section 103, section 106 does not prescribe penal sanctions for its violation.
Section 673 of the Banking Law, the particular statute that is at the center of controversy here, provides in full: “Any officer, director, trustee, employee or agent of any corporation to which the banking law is applicable, or any employee or agent of any private banker, who abstracts or wilfully misapplies any of the money, funds or property of such corporation or private banker, or wilfully misapplies its or his credit, is guilty of a felony. Nothing in this section shall be deemed or construed to repeal, amend or impair any existing provision of law prescribing a punishment for any such offense.”
With this statutory backdrop, the general events underlying the instant case may be examined. The facts are complex as the prosecution arose from a review of daily bank transactions occurring during the period from December 31, 1975 to June 28, 1976. Only a general recitation of these events is necessary, however, to resolve the issues on appeal.
The transactions at issue were carried on between American Bank & Trust Company (ABT) and a correspondent bank in Belgium, Banque Pour L’Amerique du Sud (BAS), and between ABT and an affiliate, Bankers International (BI). Defendants were connected to ABT in varying capacities. Saul Kagan was chairman of the board of ABT’s holding company, as well as an executive officer and director of ABT itself. He chaired ABT’s executive committee and was particularly involved in developing ABT’s international business. Jean Wolf headed ABT’s international division; although a senior manager, he had limited lend *201 ing authority. Torleaf Benestad was a director of both ABT and its holding company until his resignation on March 25, 1976. In addition, he was an executive officer of ABT until his retirement on April 15, 1976.
In spring, 1975, a contract to purchase ABT was made by the Graivers, a prominent Argentinian business family. Among the Graivers’ existing holdings were interests in BAS and BI. These companies began doing business with ABT almost simultaneously with the Graivers’ execution of the contract to purchase ABT. In addition, David Graiver received an office at ABT, became a director of ABT’s holding company in June, 1975, and attended ABT’s board and executive committee meetings as a guest until his election to the board in March, 1976.
In early August, 1975, David Graiver solicited from ABT loans for $2,000,000 each to BI and to Juan Graiver, David’s father. At the time the loans were made, Juan Graiver executed a pledge and security agreement covering both loans and extending to all indebtedness then or thereafter incurred. Stock valued at $8,000,000 was delivered to ABT. Both loans were eventually repaid and a second loan for $2,200,000, also secured by the same stock, was made to Juan Graiver. In March, 1976, Juan Graiver also undertook to guarantee all extensions of credit to BAS, again pledging the stock already in ABT’s possession. Thus, at all times pertinent here, ABT had $8,000,000 worth of stock to cover any extension of credit it made to BI and, after March 4, 1976, to BAS.
The specific transactions that gave rise to the indictments and convictions fall into two categories — deposits and extensions of credit. The former were three overnight deposits in BAS that ABT made at the end of December, 1975 and January and February, 1976, respectively. In each case, these were repaid on the following day. The amounts deposited, however, exceeded the 10% limit imposed by section 106 of the Banking Law.
The extensions of credit took three forms. First, BAS was permitted to overdraw its account on several occasions. This may have violated section 103 of the Banking Law when the amount of the overdraft was added to credit *202 extended in other check transactions. In one instance, the overdraft itself exceeded the 10% limit of subdivision 1 of section 103. Second, ABT “purchased” a number of checks drawn on BAS and payable to BI. A “purchase” consisted of ABT’s granting immediate credit to the payee’s account rather than waiting for collection. The third alleged form of extending credit was based on a letter dated March 30, 1976, in which ABT offered to purchase certain loans from BAS. The prosecutor likened this to a letter of credit.
Defendants’ roles in the transactions varied. For the most part, their activity consisted of authorizing or approving the transactions. Two critical facts must be noted especially: ABT suffered no losses on any of these transactions, even receiving interest when the overdrafts were paid; and none of the defendants made any profit or otherwise had any personal pecuniary interest in the transactions.
Nonetheless, these indictments followed. In essence, defendants were charged with felonies under section 673 for wilfully misapplying bank funds and credit. The indictment was predicated on the theory that defendants knowingly violated sections 103 and 106, and that those acts constituted “wilful misapplication” for purposes of section 673. Before trial, defendants moved to dismiss the indictments on the ground that section 673 requires more than merely violating civil regulations, but instead requires a larcenous intent or an intent to injure or defraud the bank.
Numerous counts were dismissed before the case was submitted to the jury, which eventually acquitted defendants of many more counts. Kagan was convicted on 33 counts and Wolf was convicted on 9 counts. Benestad eventually pleaded guilty to three counts, but sought to reserve a right to appeal the question whether section 673 requires a larcenous intent.
The Appellate Division affirmed the convictions, with one Justice dissenting. The majority, relying on People v Marcus (261 NY 268), approved the theory that any knowing violation of the Banking Law may provide a basis for prosecution under section 673. The dissent disagreed and would have reversed on the ground that, under the circumstances, defendants were denied due process because they *203 had not received fair notice that violations of sections 103 and 106 would also subject them to criminal sanctions under section 673. This court now reverses the orders of the Appellate Division.
The primary question to be decided is the meaning of “wilful misapplication” — i.e., what is the nature of the mens rea, if any, that must be alleged and proven in order to sustain a prosecution for violating section 673. The People urge that knowing violation of the Banking Law’s civil regulations suffices to establish a wilful misapplication. On the other hand, defendants argue that an actual intent to injure or defraud a bank is necessary. While it is concluded that the People too broadly interpret section 673, the defendants’ construction similarly is found to be overly narrow.
The predecessor to section 673 was first enacted in 1913 (L 1913, ch 102). The legislation was introduced at the behest of the then Superintendent of Banks so that the State Banking Law would more closely harmonize with the Federal National Banking Act (Superintendent of Banks Ann Rep, p 21 [1912]).
The correlative Federal statute at the time was section 5209 of the Revised Statutes of the United States (since amended and now codified at US Code, tit 18, § 656). That section made it an offense for a bank officer to wilfully misapply funds with the intent to injure or defraud the bank. In United States v Britton (107 US 655), the Supreme Court determined that “wilful misapplication” meant “a misapplication for the use, benefit, or gain of the party charged, or of some company or person other than the [bank]” (id., at p 666). After concluding that an actual conversion must occur, the court went on to distinguish criminal misapplication from mere maladministration of a bank’s affairs. By way of example, the opinion referred to another law limiting extensions of credit, similar to our subdivision 1 of section 103, and remarked that the directors’ civil liability for such a violation was the proper sanction for what would be nothing more than maladministration (id., at pp 667-668).
This same question was confronted in People v Marcus (261 NY 268, supra). After noting that the New York *204 statute had omitted the “intent to injure or defraud” language of the Federal law, the court concluded that the New York Legislature had taken “a broader view and made it illegal for a director knowingly to use the assets of his corporation for other than corporate purposes or proper and legitimate investment, even though [the director] had no intention of cheating or defrauding anybody.” (Id., at p 278.) Wilful misapplication occurs when the defendant has misused assets “not for the benefit of the company, but for the use and benefit of other enterprises in which [he or she is] interested.” (Id.)
In Marcus, the defendants were moving funds among several corporations of which they were the principal shareholders. Their attorney, Kresel, who advised them but did not hold any position with the bank, was held guiltless in a separate trial because of the absence of any “malevolent and criminal intent” (People v Kresel, 243 App Div 137, 141-142). Similarly, the son of one of the Marcus defendants was a young lawyer working for Kresel and participated in the scheme to the extent of handling paperwork and taking care of details; he, too, was exonerated for lack of criminal intent (People v Marcus, 261 NY, supra, at pp 294-295).
The clear implication is that “wilful misapplication” requires some form of self-dealing, some benefit to the accused’s commercial and material interests. In short, for an individual to be convicted under section 673, there must be alleged and proven some personal pecuniary interest in the transactions. Moreover, this interest must be in more than the simple benefits flowing from the gratitude of a well-served client or owner of the bank. Such an incidental bounty is not the sort of “personal benefit” contemplated by the decision in Marcus.
In the present case, there was no evidence that defendants had any personal investments in BAS or BI. To the contrary, defendants acted solely in their, positions as officers and directors of ABT without any suggestion of personal profit. Consequently, there was no basis for the charges that they wilfully misapplied ABT’s funds and credit.
*205 Accordingly, as to defendants Kagan and Wolf, who proceeded to trial, the orders of the Appellate Division should be reversed and the indictments dismissed. As to defendant Benestad, who pleaded guilty, the order of the Appellate Division should be reversed, his plea vacated, and the case remitted for further proceedings on the indictment (see People v Thomas, 53 NY2d 338).
Judges Gabrielli, Jones, Wachtler, Fuchsberg and Meyer concur with Chief Judge Cooke; Judge Jasen dissents and votes to affirm for reasons stated in the memorandum of the Appellate Division (83 AD2d 517).
In People v Kagan and Wolf: Orders reversed and indictments dismissed.
In People v Benestad: Order reversed, plea vacated and case remitted to Supreme Court, New York County, for further proceedings on the indictment.