THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* ISIDOR J. KRESEL, Appellant.

Third Department, January 16, 1935.

*John W. Davis* and *Theodore Kiendl* [*Bernard Hershkopf, Edwin F. Blair* and *Francis W. Phillips* of counsel], for the appellant.

*William Copeland Dodge*, District Attorney [*Felix C. Benvenga* and *James Garrett Wallace*, Assistant District Attorneys, and *Leroy Mandle*, Deputy Assistant District Attorney, of counsel], for the respondent.

HEFFERNAN, J. On February 10, 1931, the grand jury of the county of New York returned an indictment against appellant

and Bernard K. Marcus, Saul Singer, Henry W. Pollock and Herbert Singer. That indictment charged Marcus, Saul Singer and Pollock, as directors of the Municipal Safe Deposit Company, a corporation subject to the provisions of the Banking Law, with having, on January 13, 1930, abstracted and willfully misapplied the money, funds and property of that company, by procuring and causing such company to pay the sum of $2,009,518.45 to the Bolivar Development Corporation to enable the safe deposit company to purchase and acquire twenty-five shares of stock of the Premier Development Corporation in violation of section 305 of the Penal Law. The indictment further accused appellant and Herbert Singer, both lawyers, under section 2 of the Penal Law, with aiding, abetting, counseling and advising Marcus, Saul Singer and Pollock in the commission of the crime charged.

A severance was granted as to appellant. Upon their trials, Marcus, Saul Singer and Herbert Singer were convicted. The jury disagreed as to Pollock. Upon appeal, the conviction was affirmed as to Marcus and Saul Singer, but reversed and the indictment dismissed as to Herbert Singer (*People* v. *Marcus*, 261 N. Y. 268).

Subsequently and on November 14, 1933, judgment was rendered in the Supreme Court, Criminal Branch, New York County, convicting appellant of the crime of aiding and abetting in the abstraction and willful misapplication of the money, funds and property of the Municipal Safe Deposit Company. It is that judgment which is before us for review.

The statutes involved are Penal Law, sections 2 and 305, the pertinent provisions of which are:

" § 305. * * * Any officer, director, trustee, employee or agent of any corporation to which the banking law is applicable, who abstracts or wilfully misapplies any of the money, funds or property of such corporation * * * is guilty of a felony."

" § 2. * * * A person concerned in the commission of a crime, whether he directly commits the act constituting the offense or aids and abets in its commission, and whether present or absent, and a person who directly or indirectly counsels, commands, induces or procures another to commit a crime, is a ' principal.' "

It is important to note that the prohibition in section 305 is aimed at officers, directors, trustees and employees of moneyed corporations, and not against any one who does not sustain such a relationship to the injured corporation. It is conceded in this case that appellant was not an officer, director, trustee, employee or agent of the Municipal Safe Deposit Company, the corporation whose property, it is charged, was misapplied. Moreover, he was not its counsel.

Before discussing the questions of law involved it is necessary to give a brief *résumé* of the facts. Because appellant's trial was unusually protracted, lasting as it did, nine weeks, it is impossible, without undue prolixity, to give more than the barest outline of the transaction which lead to his indictment.

The Bank of United States was organized in 1913. It started with a capital of $100,000 which was gradually increased until it reached in January, 1930, more than $25,000,000. Saul Singer was vice-president, director and chairman of the executive committee of the bank. Bernard K. Marcus was a director and also president of the institution. In 1927 Marcus, Singer and others incorporated the City Financial Corporation, of which Marcus became director and chairman of the board, and Singer president and director. In 1928 Marcus, Singer and others formed the Bankus Corporation. The Bankus Corporation acquired practically all the stock of the City Financial Corporation. Each stockholder of the Bank of United States was also a stockholder of the Bankus Corporation. Later a third company, known as the Municipal Financial Corporation, which had been affiliated with the Municipal Bank and Trust Company, was taken over by the Bank of United States and thereupon the Bankus Corporation and the City Financial Corporation absorbed the stock of the Municipal Financial Corporation. As the City Financial Corporation had been previously absorbed into the Bankus, the Bankus Corporation was the City Financial Corporation and the Municipal Financial Corporation. It owned or controlled the stock of the other two. At the same time the Bankus Corporation was owned by the stockholders of the Bank of United States. The Bankus Corporation, the City Financial Corporation and the Municipal Financial Corporation were affiliates of the Bank of United States. Marcus and Singer not only controlled and dominated these affiliates but also in large measure they directed and controlled the affairs of the bank itself.

The Municipal Safe Deposit Company, the corporation named in the instant indictment as the one whose funds were misapplied, was organized in 1924. Subsequently its stock was acquired by the Bank of United States and Marcus and Singer became directors thereof and controlled its affairs.

In January, 1930, the Bank of United States, in addition to owning the stock of the Municipal Safe Deposit Company, also owned and controlled the stock in the City Safe Deposit Company and the Colonial Bank Safe Deposit Company.

In January, 1930, the three affiliates owed the Bank of United States $12,000,000 on their unsecured notes, each corporation

being indebted to the extent of $4,000,000. The Superintendent of Banks criticized these loans and insisted that they should be promptly reduced. The affiliates had no cash and not sufficient assets with which to liquidate their indebtedness. To meet the objections of the Superintendent of Banks a devious series of transactions were conceived. Ultimately that has been referred to in the record as the Bolivar plan, and the transaction which is the subject of attack here was adopted.

In order to obtain funds the affiliates transferred what assets they had, of a book value of $4,838,073.81, to Premier Development Corporation, a holding company controlled by Marcus and Singer, for 100 shares of its stock. The affiliates then sold the 100 shares of Premier Development Corporation to Bolivar Development Corporation, also controlled by Marcus and Singer, for the same price for which they had bought the stock. Bolivar Development Corporation then sold this stock to the three deposit companies for $8,038,073.81, or at an appreciation of $3,200,000 over the price Bolivar Development Corporation had paid therefor.

The stock was divided among the deposit companies in certain proportions. The Municipal Safe Deposit Company obtained twenty-five shares for which it paid $2,009,518.45. The other two deposit companies paid cash for their stock. The three deposit companies borrowed from the Bank of United States on their unsecured notes the purchase price of the stock. The Bolivar Company then paid to the three affiliates the purchase price of the 100 shares of Premier stock amounting to $4,838,073.81. That left Bolivar Company with a balance of $3,200,000 which it loaned to Bankus. Both the Bankus Company and the City Financial then paid to Bank of United States each the sum of $4,000,000 which they obtained in part from the sale of the Premier stock and in part from loans from their subsidiaries.

From what has been said it is obvious that the indebtedness of $8,000,000 of the Bankus and City Financial Corporations to Bank of United States was transferred to the deposit companies for no legitimate purpose of their own, but solely for the payment of the debts of the two financial corporations. Concededly this was the plan conceived and consummated by Marcus and Singer and carried out on January 13, 1930.

That brings us to the main inquiry as to appellant's connection with this plan. As I interpret the evidence his sole connection with the transaction was as a lawyer.

The offense of which appellant was convicted involves no moral turpitude and it is undenied that it was based on a transaction which caused injury to no one. No one lost a dollar, no one gained

a dollar, by the transaction. Appellant was counsel for the Bank of United States, for Bankus Corporation and for City Financial Corporation, all of which were interested in the manipulation of the resources of the bank and its affiliates. He was the adviser of Marcus and Singer, the executives of these institutions. It is not denied that they presented to him the Bolivar plan. Appellant asserts that he believed the proposal to be lawful. On January 11, 1930, he advised Marcus and Singer that before anything was done in the matter the plan should be submitted to the Superintendent of Banks for his approval. It is uncontradicted that appellant's last connection with this transaction was on that date and that his last word was that nothing should be done until the approval of the Banking Department was obtained. Nevertheless, the plan was executed on January 13, 1930, without the knowledge or consent of appellant.

Marcus and Singer of course committed the crime with which they were charged. In the *Marcus* case the Court of Appeals held that the two officers of the safe deposit company could commit the crime defined in section 305 of the Penal Law, if they did an act which made an *ultra vires* application of the money of the safe deposit company, even though they did so with an innocent purpose. For such fiduciaries, the court held that the willfulness denounced in the statute required nothing more than conscious and not inadvertent, even though morally innocent, action. In other words, the prohibition of the statutes is aimed against those who, by virtue of their office or employment, occupy a position of trust in such institutions. Such officials and employees are plainly fiduciaries of the moneyed corporation.

The doctrine in that case should not be extended to include those occupying no relation of trust and confidence to the deposit company itself. In order for one, not an officer or employee of a moneyed corporation, to be an aider and abettor of the crime, he must have an actual criminal intent; he must be guilty of an action involving moral turpitude.

That is precisely what the Court of Appeals held in the *Marcus* case as to Herbert Singer. Singer, like Kresel, was charged in the same indictment as an aider and abettor. He, too, like Kresel, was not an officer, director, trustee, employee or agent of the deposit company, and was not in any trust or fiduciary relation to it. The Court of Appeals directed his acquittal as a matter of law because there was no proof of any wicked or criminal intent on his part, notwithstanding the fact that he was one of the principal actors, both in the planning and in the consummation of the forbidden act.

Kresel, in this case, stands in the same position as did Singer in that case, and consequently he, too, must be held guiltless, unless his connection with the transaction is tainted with a malevolent and criminal intent.

The trial court, however, erroneously charged the jury that the only intent required to be shown as to an aider and abettor was the same intent as is required in the case of a director, namely, an intent to do the prohibited act. The trial court committed serious and prejudicial error in instructing the jury that appellant could be found guilty of the crime charged, even though he were acting in perfect good faith.

There is no evidence that appellant urged or incited any one to commit any offense. The extent of his offending is that he failed to forbid his clients to proceed. He swore that he believed the plan to be within the law. The court of last resort has since held that he was mistaken. When appellant gave his advice the question was unsettled. It is worthy of note that neither the Appellate Division nor the Court of Appeals was unanimous in its construction of the law. A lawyer is not to be held criminally responsible because he honestly gives mistaken advice upon a doubtful question of law. No lawyer is answerable if he is mistaken concerning a question of law on which reasonable doubt may be entertained by well-informed lawyers. (*Pitt* v. *Yalden*, 4 Burr. 2060; *Godefroy* v. *Dalton*, 6 Bing. 460, 467; *Bowman* v. *Tallman*, 40 How. Pr. 1; *Hill* v. *Mynatt*, 59 S. W. 163; *Savings Bank* v. *Ward*, 100 U. S. 195; *Campbell* v. *Brown*, 2 Woods, 349; *Byrnes* v. *Palmer*, 18 App. Div. 1; affd., 160 N. Y. 699; *Patterson* v. *Powell*, 31 Misc. 250; affd., 56 App. Div. 624; *People* v. *Clark*, 242 N. Y. 313; *Rapuzzi* v. *Stetson*, 160 App. Div. 150; *Citizens Loan, etc., Assn.* v. *Friedley*, 123 Ind. 143; 23 N. E. 1075; *Firpo* v. *United States*, 261 Fed. 850.) In *Montriou* v. *Jefferys* (2 Carr. & P. 113) Lord Chief Justice ABBOTT said: " No attorney is bound to know all the law; God forbid that it should be imagined that an attorney, or a counsel, or even a judge is bound to know all the law."

Infallibility is an attribute of neither lawyer nor judge. And yet in this case the trial court said to the jury that appellant was conclusively presumed to know the law and that the law involved herein was plain and unambiguous. It is a silly perversion of the legal fiction that everyone is bound to know the law, to insist that, in this field of law, lawyers shall decide all questions in accordance with what the courts may ultimately hold, at the peril that the failure to prophesy correctly the final outcome will make them criminal accessories.

Appellant's counsel criticizes the summation of the district attorney and asserts that he was permitted an unwarranted license of tongue. After careful consideration of the district attorney's final argument it seems to us that he resorted to extraneous topics for the purpose of blinding the judgment and inflaming the passions of judge and jury. One would have to be possessed of a boundless credulity indeed to believe that it had no prejudicial effect.

There are many things in this record which an impartial judge cannot contemplate with approbation. It is only possible to advert to a few. Although it was conceded that no one profited or lost because of the crime charged and that it had no effect on the closing of the Bank of United States, nevertheless the district attorney told the jury that the crime " that we are concerned with    *    *    * was committed with relation to the Bank of United States." He referred to bankers stealing " depositors' money." He pleaded with the jury to " give a little attention to the poverty of depositors, who are mulcted by these people, and do not worry about the poverty of this defendant." He said appellant was nothing but a " pilot fish " that guided " sharks that scour the financial seas." Kresel while nominally on trial on the charge contained in the indictment was actually on trial for the crimes of every faithless banker.

Appellant called a number of witnesses to testify to his good character, some of whom are eminent in State and nation. The district attorney made no effort to impeach them. He referred to them, however, as " a veritable parade of the wooden soldiers," and as " Bar Association pundits." He asserted that the reason these persons came to appellant's aid was because " they have used him; " " he has been one of them; " " they have put him forward."

It developed on the trial that appellant had acted as counsel in the Ambulance Chasing Investigation ordered by the Appellate Division of the First Department. In his summation the prosecutor in referring to his activities in that investigation said of appellant: " Certainly he has his friends among the Bar Association lawyers. They have used him; he has been the bloodhound that has tracked down the little shysters, the little lawyer, the man who has done wrong.    *    *    *    He was cold, he was relentless, he was implacable, in the pursuit of the little shyster, the little ambulance chaser, the pothouse politician." The effect of this statement was to denounce appellant for the public services he rendered. Who can doubt that this had a prejudicial effect on the jury? These incidents transpired without admonition, without rebuke, without condemnation from the trial court.

We must refer to the charge of the learned trial judge because in our opinion it is of such a character that the rights of appellant were seriously prejudiced by it. Whatever is here stated in criticism of the charge is not in any way intended as a reflection upon the ability of the learned court below, nor as in any way questioning his desire and endeavor to aid the jury fully to understand what was involved for their decision, for it is assumed unquestionably that he earnestly strove to discharge his duty in instructing the jury as he conceived his duty to be. Undoubtedly he endeavored to accord to the People and to the accused an impartial hearing. The length of the charge furnishes convincing proof of great industry and care in its preparation. Our criticism of it is that it was too prolix to be understandable. The main charge occupied 163 pages of the printed record and more than eight hours were consumed in its delivery. The mere statement of this fact justifies the conclusion that the jurors were not clearly and concisely instructed on the issues submitted to them and as to the law applicable to the case. It seems incredible to us that twelve laymen could intelligently comprehend and apply what the court said.

I concur in what Presiding Justice HILL has written as to errors committed in the reception and exclusion of evidence.

Finally we are convinced that legal guilt was not brought home to Kresel. The evidence is insufficient to warrant his conviction. The judgment in this case is grossly wrong and a wicked perversion of justice. It not only places the stigma of a felon upon Kresel but deprives him of his liberty, his profession and his honor, for conduct without taint of moral turpitude or personal profit and for advice given in good faith in his capacity as a lawyer. It should be reversed and the indictment dismissed.

CRAPSER, J., concurs; RHODES, J., concurs for reversal and dismissal of the indictment, with a separate memorandum; HILL, P. J., and BLISS, J., vote to reverse the judgment of conviction and for a new trial, with an opinion by HILL, P. J., in which BLISS, J., concurs, with a memorandum.

RHODES, J. (concurring). I concur for reversal of the judgment of conviction and dismissal of the indictment.

I can see no practical distinction between the status of Kresel and Herbert Singer who was charged in the same indictment with aiding and abetting the commission of the crime therein charged. Aside from the fact that Kresel was a director of the Bank of United States and Herbert Singer was not a director thereof, each

had a personal interest in the promotion of the transaction; each was a lawyer. While Herbert Singer was a clerk in Kresel's firm and was described by the Court of Appeals as a "neophyte," his activities relative to the transaction were certainly as great as were those of Kresel and there is no question but that he knew what he was doing and what was intended to be done. If he was not criminally liable, I am unable to discover any reason why Kresel is culpable.

I concur with the views of Justice HEFFERNAN except as to the question of intent; as to that matter I concur with Presiding Justice HILL.

By section 2 of the Penal Law a principal is one who aids and abets the commission of "the act constituting the offense;" also one who induces or procures another "to commit a crime" is a principal.

I fully agree that assuming the indictment should not be dismissed, a new trial should be had because of the erroneous rulings discussed by Presiding Justice HILL, and further that a new trial should be had in the interest of justice because the charge, while it covered the whole range of evidence, did not concisely and definitely state the issues the jury were to determine nor the law applicable thereto; and further because the summation of the district attorney transcended proper limits in that it tended to arouse the passions and prejudices of the jury. In a case otherwise free from objection, if the guilt of the defendant were clearly established, the prejudicial remarks of the district attorney might perhaps be overlooked, but in this case where the defendant had to contend against so many and so serious invasions of his rights, the added burden cast upon him assumed serious proportions.

HILL, P. J. The defendant has been convicted of aiding, abetting, counseling and procuring (Penal Law, § 2) three persons, Marcus, Saul Singer and Pollock, in abstracting and willfully misapplying the money, funds and property of Municipal Safe Deposit Company, a corporation to which the Banking Law is applicable (Penal Law, § 305). Marcus, Saul Singer and Herbert Singer have been convicted in an earlier trial for their participation in the misapplication, and the judgment of conviction as to Marcus and Saul Singer has been affirmed, but reversed as to Herbert Singer. (*People* v. *Marcus*, 261 N. Y. 268.)

In the transactions here involved, the Bank of United States, organized under the Banking Law of the State of New York, was the parent corporation. Its officers and directors, in the frenzied financial days preceding the historic crash that occurred late in 1929, had organized or acquired through merger three affiliates,

Bankus Corporation, City Financial Corporation and Municipal Financial Corporation, that dealt in securities and engaged in financial ventures in a field not permitted banks under the Banking Law; also three safe deposit companies, Municipal Safe Deposit Company, City Safe Deposit Company and Colonial Safe Deposit Company. There was a common ownership of the seven corporations and also of numerous smaller subsidiaries organized for and devoted to the management of individual real estate and city building ventures. One share of the stock of the bank together with one share of stock of Bankus was known as a unit, and represented ownership in all of the allied corporations. These units were traded in by the general public, encouraged through stock manipulating maneuvers carried on by the bank management, including defendant, acting through some or all of the affiliates and through one or more syndicates made up of some of the individual officers and directors of the bank. In various ventures the three affiliates borrowed heavily of the bank, and about January 1, 1930, the aggregate of these loans was substantially $12,000,000. According to its books, the bank had $42,000,000 of capital, surplus and undivided profits. Under the statute, not more than ten per cent thereof could be loaned to any one person, firm or corporation. Considering the affiliates as separate corporate entities, $12,000,000 could be loaned to the three under the statute. The State Superintendent of Banks, however, in a report and criticism made following an examination, held and determined that because of the common ownership and substantial merger of the three affiliates, they were to be considered as one corporation and it followed that the loan of $12,000,000 was $8,000,000 above the statutory limit.

The acts of Bernard K. Marcus and Saul Singer, respectively president and chairman of the board of directors of the bank and directors in all of the corporations mentioned, but particularly, so far as this case is concerned, of Municipal Safe Deposit Company, in substituting the three deposit companies for the three affiliates as debtors to the bank to the extent of $8,000,000, constituted the criminality for which they were convicted under section 305 of the Penal Law. The defendant was chief attorney for the entire group of corporations. Herbert Singer, an attorney, twenty-six years of age, the son of Saul Singer, was employed by defendant, whose principal law office was in the downtown section of New York city. Herbert was assigned to look after the work and interests of the Bank of United States and he stayed at its offices. In carrying out the scheme to substitute the three deposit companies as debtors to the bank as to a part of the debt of the affiliates, Municipal Safe Deposit Company gave a note for slightly more than $2,000,000

as the purchase price of twenty-five shares of the capital stock of the Premier Corporation (the identity of this corporation and the corporate maneuvers I will discuss later), and the vendor, another corporation, paid its assumed debt to the affiliates with part of the note and loaned them the remaining portion, and they in turn transferred it to the bank and took credit on the $12,000,000 indebtedness. The trek of this note on its tortuous way from one corporation to another had been determined necessary to save the corporate participators from paying taxes on profits which the scheme of substitution indicated. The profits unquestionably were wholly imaginary and any liability for taxes thereon would have arisen only from the bookkeeping entries. The giving of the note for an *ultra vires* purpose and for an inadequate consideration was the particular act which the court of last resort in this State (*People* v. *Marcus, supra*) determined to be a willful misapplication of the property of Municipal Safe Deposit Company, and a willful misapplication of its credit under section 305 of the Penal Law which reads, so far as it applies: "Any officer, director, trustee, employee or agent of any corporation to which the banking law is applicable, who abstracts or wilfully misapplies any of the money, funds or property of such corporation, or wilfully misapplies its credit, is guilty of a felony." No person suffered a loss or was unjustly enriched by the transaction. It was carried through after all the details had been disclosed to Egbert, Deputy Superintendent of Banks, and the evidence would justify a finding that the entire plan, in advance of its final adoption, had been submitted to Broderick, the Superintendent of Banks, and that if he did not " approve " the plan, he did not " object " to it. The Court of Appeals has determined that the act is *malum prohibitum* under the quoted section as to Marcus and Saul Singer who participated in the misapplication as directors of Municipal Safe Deposit Company.

Kresel's claimed guilt arises through his advice as general counsel, in conference with Marcus, Saul Singer and other employees and officials of the bank and its subsidiaries, and with the Superintendent or Deputy Superintendent of Banks and the giving of a qualified approval to the plan of substituting debtors and of the details worked out by Herbert, his clerk. The debtor affiliates were without assets that could be sold in the general market, and if the directions and orders of the Superintendent of Banks that the loans to the affiliates be reduced were followed, some kind of intercompany transaction was necessary, otherwise, and as an extreme penalty for failure to obey the official mandate, the bank would be closed, and allied financial structures dependent thereon would fall, bringing not only loss to the individual investors and promoters, but

adding another failure to an already long list which at that time had shaken public confidence. Extreme measures were being used then to prevent additional financial shocks.

During 1929 individual bank examiners had made reports containing general criticisms of the relations of the bank with its affiliates. In the early days of January, 1930, the criticisms had centered upon the $12,000,000 loan. Broderick, the Superintendent, says that at this time neither the solvency of the Bank of United States nor any of the affiliated corporations was questioned, but a conference concerning the loans to the affiliates was had between himself, Marcus, Saul Singer and, the Superintendent says, defendant was present (this is denied by defendant). It was then proposed, Broderick says, that the affiliates would sell securities to the bank, taking credit for the purchase price. The reply which the Superintendent says he gave to that proposal was, "I told * * * them that if they sold securities to the Bank of United States which the bank could buy, we would insist upon the obligation of the original borrowers being retained." Further, the Superintendent says that on January eleventh Marcus and Saul Singer called upon him, the defendant not being present, and he then was told that the affiliates contemplated selling $12,000,000 of securities to the safe deposit companies. Broderick alone among all the witnesses on both sides says the proposal was to sell $12,000,000 rather than $8,000,000 of securities. He says he told them he would not approve such a proposition, but that it was mentioned that McArdle (an accountant) would call at the Department again on Monday, the thirteenth of January. It is hard to understand why a subordinate would call upon him on a later date if the plan outlined by the principals had been definitely disapproved. The Deputy Superintendent of Banks, Egbert, who was present, directly after the conference dictated his then recollection of Broderick's attitude to be that he "would not approve, but might not object." This evidence, together with the return visit of McArdle, would support an inference that further details of the plan were asked by Broderick. On the same day, Saturday, January eleventh, at the offices of City Financial Corporation, a conference was had between Marcus, Saul Singer, Herbert Singer, two McArdles and defendant, and the entire plan and scheme for substituting the deposit companies as debtors for a part of the affiliates' debt was arranged. Essentially it was that securities carried upon the books of the affiliates as of the value of $4,838,073.81 were to be transferred to Premier Development Corporation (this has been described as a dummy corporation. It had been incorporated by one Pollock, an attorney and director of the bank. It had never exercised any

corporate rights until its career in this plan began) in return for the one hundred shares of its stock. These shares were to be sold to Bolivar Development Corporation (a second dummy and companion to Premier) for which Bolivar was to pay the affiliates the sum at which the securities were carried on their books. Bolivar was then to sell the hundred shares of Premier stock to the three safe deposit companies, Municipal Safe Deposit Company to take twenty-five shares thereof and to pay $2,009,518.45 (this amount with the amounts paid by the other two safe deposit companies made up $8,003,873.81). Bolivar paid to the affiliates the book value of the securities and had remaining $3,200,000 which it loaned to Bankus. By the loan and the payment, the entire $8,003,873.81 theoretically passed into the coffers of the affiliates and was paid to the bank to reduce the loan. The three safe deposit companies borrowed from the bank the amount which they paid, and were indebted in the exact amount by which the loan to the affiliates was reduced. The use of the Bolivar and Premier links in the chain was suggested by one of the McArdles for tax purposes, to conceal the appreciation above the amount at which the securities were carried on the books. It was either Marcus or Saul Singer, at the January eleventh conference, who suggested the essential act of selling to the safe deposit companies at a paper profit of $3,200,000 securities belonging to the affiliates which they had selected and valued. The plan as finally developed at that conference involved a repurchase agreement whereunder Municipal Financial Corporation (one of the affiliates) and Bolivar agreed to repurchase from Municipal Safe Deposit Company the twenty-five shares of Premier stock at the price paid, with interest. This instrument bears the handwriting of defendant as to changes in terminology, and notations were made by him upon the sheet whereon was listed the securities sold by the affiliates. At the conference all the details were discussed and general approval given by the defendant, and he finally instructed his clerk and assistant, Herbert Singer, to go ahead and put the transaction through if it was approved by the Banking Department. The evidence indicates that McArdle again called at the Banking Department on Monday, January thirteenth, and thereafter telephoned Herbert Singer that the plan was approved. Egbert, the Deputy Superintendent, says that in the absence of Broderick he disapproved the plan when it was outlined to him by McArdle on Monday, and that neither he nor the Superintendent had knowledge of the transaction until in the March following; however, that when they learned of it, no steps were taken looking to a rescission, and the bank continued to function as such until

December 11, 1930, when it was taken over by the Superintendent. Under these circumstances, the preponderance as to veracity is with McArdle and Singer.

The direct proof of defendant's participation in the criminal act for which he has been convicted (aiding and abetting Marcus, Singer and Pollock in misapplying the money, funds and property of Municipal Safe Deposit Company on January 13, 1930) is limited to the events which transpired at the conference or meeting of January eleventh with Marcus, the two Singers and two McArdles at the office of City Financial Corporation. According to Broderick, the plan discussed at the earlier meeting when he was called upon by Marcus, and he thinks Singer and Kresel, did not involve the safe deposit companies as substituted debtors, or otherwise. It was Marcus or Singer who devised the basic plan of substituting the deposit companies as debtors in place of the affiliates, and they selected the securities to be transferred and fixed their value. In the *Marcus* case it was determined by a majority of the Court of Appeals that Saul Singer originated the idea. " The scheme and plan of transferring the debts of the financial corporations to the safe deposit companies were not his [Herbert Singer] but his father's, [Saul Singer] and the father on the stand took all the responsibility " (p. 294). Thus the aid given by defendant was limited to details, the legal and corporate machinery, and undisputed it is that the approval and directions which defendant gave were qualified. Herbert was told to carry the transaction through in the event the Superintendent of Banks, after full information, approved. I have not overlooked defendant's evidence before the grand jury which is susceptible of a construction indicating guilty knowledge. I am not impressed by his explanation that his testimony was incorrectly reported by the stenographer. The context of the entire statement does not sustain his argument. However, an innocent and timid man is quite as apt to flee as a guilty one. This testimony could well have been given in a panicky effort to lay the baby on some one else's door step when criminal charges were impending. Its force to indicate wrongful intent is broken by defendant's unquestioned instructions that the plan and scheme be disclosed to the Superintendent of Banks, and it was this official who, representing the public, had control over the doings both of the bank and the deposit companies and it was his direction and ruling that made the substitution necessary. Thousands of pages of circumstantial evidence have been received as bearing upon the acts limited to a single afternoon, and as to some of the circumstances the People went far afield. Defendant should not be required to make vicarious atonement for all the sharp but not criminal practices

in which the entire Bank of United States' crowd indulged, and through which the public lost money through stock purchases, when they had hoped to gain. These acts were within the law and at the time when they were practiced were regarded as smart rather than questionable.

In determining what intent is necessary to establish guilt in this case, our court neither is required nor permitted to reason by analogy from the opinions in cases like *People* v. *Clark* (242 N. Y. 313) and *People ex rel. Perkins* v. *Moss* (187 id. 410), for the Court of Appeals in *People* v. *Marcus* (*supra*) has determined the exact question on the very facts here presented. I am unable to agree with Judge HEFFERNAN and the arguments advanced on behalf of defendant that the intent necessary in this case is other than that held sufficient as to Bernard K. Marcus and Saul Singer. As to them, it has been decided that proof of intent to do the act forbidden is sufficient. I do not read the portion of the prevailing opinion in the *Marcus* case that applies to Herbert Singer as indicating that because he was an attorney it was necessary to establish an intent to do something inherently wrong and criminal as distinguished from an intent to do the act made criminal by statute. The opinion states: " No doubt the young man was quite * * * profuse in his advice. * * * It is inconceivable that Saul Singer who, in thirty-two years after landing in this country, had passed from the crockery, steam laundry and garment business to the position of one of the leading financiers in New York city, could be influenced or directed by the young son he had brought up in the soft places in life." The opinion further states that Saul Singer would be " little swayed by the neophyte, fresh from his books." I do not assume that the indictment was dismissed as against Herbert upon the theory that the neophyte, the man twenty-six years of age who had been brought up in soft places, was so immature and pampered that he was incapable of forming an intent, but rather that a necessary element named in the Penal Law, section 2, was lacking, that while he *counseled*, he did not *induce* the older men to commit the crime, that the advice which he gave was not followed and had no effect upon the determination already formed by them to carry through the essential features of the plan. I agree with the trial judge that the only intent necessary was that Kresel intended to aid and abet Marcus, Saul Singer and Pollock in doing the act forbidden by section 305 of the Penal Law. Collateral facts showing the relations between Kresel, Marcus and Saul Singer were relevant to show the existence of a conspiracy. If the jury found that a conspiracy existed, the acts of one conspirator could be proved against another if they were in furtherance of the

common design. (*People* v. *Cassidy*, 213 N. Y. 388; *People* v. *Storrs*, 207 id. 147.) Under this indictment the common design toward which they must have tended was the giving of the $2,000,000 note by Municipal Safe Deposit Company, and not the creation of the debt owing by the affiliates. In this case many facts were proven, and arguments made thereon, showing that the depositors of the bank had suffered loss, and the arguments were even extended to the losses suffered by depositors of other banks, and the losses sustained by persons who had purchased units. Reports of the Banking Department and documents prepared by bank examiners were received in evidence. Many of these had not been called to the attention of defendant and were hearsay as to him. Much evidence in this record was received upon the theory of a conspiracy which made admissible the acts and utterances of a co-conspirator before and in furtherance of the criminal misapplication. This properly could be considered by the jury only in the event they found that a conspiracy did exist between defendant, Marcus and Singer.

The excluded evidence as to the remarks made by Broderick to the directors of the bank on the early morning of December 11, 1930, is competent upon two theories. It is undisputed that defendant qualified his approval of the plan by requiring that it be submitted to and approved by Broderick, who testified that his approval was not given. It was competent to show that he had made statements at other times indicating approval. He was asked if he did not say to the assembled directors of the bank: " I have watched that bank closely for fifteen months, and know as much about it as any man living, with the possible exception of the president of the bank. I want you men to know that in all that examination I have not found one single act that reflects on the honesty or integrity of a single officer or director of the bank. Furthermore I want to say I want to express my admiration of the courage and resourcefulness of your president." If he made that statement at the time indicated in the question, which was months after he knew of this entire debt substituting transaction, it gainsays his testimony that the plan was carried out after he had disapproved it, and upon the false representation that he had approved. It was not a collateral issue concerning which his statement on the stand was binding upon defendant. Further, the issue as to criticisms by or on behalf of the Superintendent of Banks was sharply litigated. If it were competent for the People to show criticism, by the same token it was competent to show approval, and the excluded statement indicated approval by the Superintendent. Much evidence that was inadmissible was received as bearing upon

intent. The quality of intent necessary to establish guilt is determinative of the relevancy of many collateral facts. The length and detail of the charge obscured the exact issue which the jury was to decide.

The summation on behalf of the People imputed to defendant responsibility for the sins of bankers in and out of the Bank of United States, and the loss by depositors of that bank and of other banks.

The judgment of conviction should be reversed in the interests of justice, and a new trial ordered.

BLISS, J., concurs.

BLISS, J. (concurring). I vote to reverse the judgment of conviction and grant a new trial. I concur in the opinion of our presiding justice and also in the statements contained in the opinion of Mr. Justice HEFFERNAN in regard to the summation of the district attorney and the length and lack of clarity of the charge.

Judgment of conviction reversed and indictment dismissed.